UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE HARENTON HOTEL, INC. and
RANDY M. HARE,

                                Plaintiffs,

            v.                                                      **DECISION AND ORDER**
                                                                    12-CV-235S

VILLAGE OF WARSAW, DANIEL HURLBURT,
and VALERIE DUELL,

                                Defendants.

## I. INTRODUCTION

In this action, The Harenton Hotel, Inc., and Randy M. Hare assert a variety of

federal and state claims against the Village of Warsaw and two of its municipal employees

arising from a failed commercial construction project, including claims under the First and

Fourteenth Amendments to the United States Constitution.[1]  Defendants have moved for

summary judgment and Plaintiffs have cross-moved to amend their complaint.   (Docket

Nos. 54, 64.)   For the reasons that follow, Defendants' motion is granted in part and

denied in part, and Plaintiffs' motion is denied as moot.

---

[1] There is insufficient evidence of The Harenton Hotel, Inc.'s standing.   Hare formed this corporate entity
to eventually own and operate The Harenton Hotel, which was never completed.   (Deposition of Randy
M. Hare, November 28, 2011, Docket No. 54-8, pp. 6-8.)   No evidence has been presented that the
corporate entity ever acquired any ownership or other rights in the Harenton Hotel project or that it ever
suffered any injury attributable to Defendants.   Consequently, any claims brought by The Harenton Hotel,
Inc. are dismissed for lack of standing.   See Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S. Ct. 1717,
1723,109 L. Ed. 2d 135 (1990) ("To establish an Article III case or controversy, a litigant first must clearly
demonstrate that he has suffered an 'injury in fact.'"); Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340,
344 (2d Cir. 1998).

1

## II. BACKGROUND[2]

Randy M. Hare is a real estate developer. (Declaration of Randy M. Hare ("Hare Decl."), Docket No. 61, ¶ 1.) At some point in 2007, Hare entered a purchase agreement with E-Properties for a former nursing home located at 283 North Main Street, Warsaw, N.Y.[3] (Hare Decl., ¶ 1; Deposition of Randy M. Hare ("Hare Dep."), November 28, 2011, Docket No. 54-8, pp. 6-8; § 50-h Examination Transcript ("§ 50-h Transcript"), Docket No. 59-5, p. 4.) Hare's intention was to remodel the nursing home into a 50-room luxury hotel. (Hare Decl., ¶ 1; Hare Dep., p. 8; Hare Presentation Package, Docket No. 54-5.)

### A. Oversight of the Harenton Hotel Project by Donald Williams

On May 1, 2007, after public hearings by the Village of Warsaw Planning Board, the Village of Warsaw Zoning Board of Appeals, and input from other agencies and entities, the Village of Warsaw Planning Board approved Hare's request to convert the nursing home at 283 North Main Street into a hotel, including the addition of a carport.[4] (Hare Decl., ¶¶ 4, 5; Affidavit of Donald Williams ("Williams Aff."), Docket No. 60-4, ¶ 3.) The Zoning Board granted several variances for the project, including a "use variance" to

---

2 This section is drawn from the record evidence submitted by the parties. But for paragraphs 1, 6, 7, 9, 19, and 20, this Court has not considered Defendants' "Statement of Stipulated Facts" (Docket No. 54-2), because it fails to include the required citations to admissible evidence. See Rule 56 (a)(1) of the Local Rules of Civil Procedure for the Western District of New York (requiring that each statement of fact "be followed by citation to admissible evidence as required by Fed. R. Civ. P. 56 (c)(1)(A)"). The same is true for several paragraphs in the Affidavit of Gerald E. O'Connor, Docket No. 54-1.

3 Hare purports to bring this action both individually and as an agent for E. Properties. (Amended Complaint, ¶¶ 1, 8, 9.) Hare has not, however, submitted any evidence establishing that he has proper authority to act as E. Properties' agent. He is therefore not considered as such.

4 In his declaration, Hare states that he received approval on May 1, 2006. (Hare Decl., ¶ 5.) That date appears to be incorrect, since Hare earlier stated that he took no action on the project before securing the purchase agreement from E. Properties in 2007 (§ 50-h Transcript, pp. 5-6) and Williams issued the building permit in 2007 (Williams Aff., ¶ 3).

convert the nursing home into a hotel and three "area variances," which pertained to building height, setback for a carport, and parking. (Hare Presentation Package, Docket No. 54-5.)

On September 14, 2007, Donald Williams, the Building Inspector and Code Enforcement Officer for the Village of Warsaw, issued Hare a building permit. (Application for Building Permit, Docket No. 54-6; Williams Aff., ¶¶ 1, 2, 3.) Hare immediately began construction. (Hare Decl., ¶ 6.)

For the next two years or so, Hare continued demolition and construction. The parties dispute the progress of construction, with Hare maintaining that he worked on construction "as intended" between 2007 and 2009, and Defendants maintaining that construction stalled before significant progress was completed. (Hare Decl., ¶ 6; Affidavit of Gerald E. O'Connor, Docket No. 54-1, ¶ 11.) Regardless of the progress, Williams believed that the work Hare completed after he issued the permit was performed in accordance with the approved architectural and engineering drawings and the permit requirements. (Williams Aff., ¶ 4.)

It was Williams's understanding that the approved permit authorized Hare to construct a hotel, restaurant, and one apartment. (Williams Aff., ¶ 5.) In addition, Williams permitted Hare to occupy the apartment on the property during construction, which Williams attests was consistent with the permit and provided a security benefit. (Williams Aff., ¶ 5.) But this permission appears to be in contravention of the permit application, which provides that "[n]o building shall be occupied or used in whole or in part for any purpose whatever until an application is made for and a Certificate of Occupancy

3

shall have been granted by the Building Department." (Building Permit Application, p. 1.)

On October 15, 2008, Williams granted Hare a one-year extension of his original permit. (Hare Decl., ¶ 7; Williams Aff., ¶ 7.) According to Williams, it was the Village of Warsaw's policy to routinely grant extensions of an original permit without requiring further approval from the Planning Board or Zoning Board of Appeals. (Williams Aff., ¶ 7.) In Williams's experience over his 23-year career, an extension of a building permit included the extension of any prior approvals from the Planning Board and Zoning Board of Appeals, including approval of site-development plans. (Williams Aff., ¶ 8.) The Village of Warsaw also never deemed a previously approved site plan expired after one year when there was a pending permit and extensions to the permit. (Williams Aff., ¶ 9.) In his deposition, however, Williams admitted that he had never worked on a project as large as the Harenton Hotel project and that he had never handled a project involving multiple applications for extension of a building permit. (Deposition of Donald Williams ("Williams Dep."), January 13, 2015, Docket No. 54-26, p. 41.)

Williams retired in May 2009. (Williams Aff., ¶ 2.) At that time, it was his understanding that Hare had abandoned the Harenton Hotel project. (Williams Dep., p. 44.) But before that time, Williams's impression was that all of Hare's work on the Harenton Hotel project was consistent with the building permit. (Williams Aff., ¶ 10.) Williams maintains that he left all records of his inspections in his desk at the Inspector's Office in the Village of Warsaw when he retired. (Williams Aff., ¶ 6.)

## B. Oversight of the Harenton Hotel Project by Daniel Hurlburt

In October 2009, the Village of Warsaw appointed Daniel Hurlburt to replace Williams as Code Enforcement Officer. (Hare Decl., ¶ 8.) On October 5, 2009, Hare timely applied to Hurlburt for another extension of his building permit. (Hare Decl., ¶ 9; § 50-h Transcript, p. 10.) Hurlburt denied Hare's application for an extension and advised him that he had no record of the Harenton Hotel project. (Hare Decl., ¶ 9.) Hurlburt further advised Hare that Williams, the prior inspector, "had done everything wrong" and that Hare would have to start the process anew because his prior applications were incomplete. (§ 50-h Transcript, pp. 10-11.) Hurlburt therefore directed Hare to re-submit his permit application and documentation related to the Harenton Hotel project. (Hare Decl., ¶ 10.)

While Hurlburt was considering the permit extension application, he issued a "Stop Work" order and directed Hare to vacate the property, where Hare had been living for two years. (Hare Decl., ¶ 11.) When Hare inquired further about his application, the Village Attorney, David DiMatteo, further advised Hare that his building permit had expired and that he would have to start the entire permit application process over. (Hare Decl., ¶ 12.)

In November 2009, Hare brought a set of prints to the Village Hall to show Hurlburt what had already been submitted to the Village. (§ 50-h Transcript, p. 11.) Hurlburt advised Hare at that time that he had to further investigate what would be permitted on the project. (§ 50-h Transcript, p. 11.)

Since Hare was having no success with Hurlburt and the Village of Warsaw building department, he contacted the New York State Code Enforcement Office for

guidance on how to get his project started again.   (Hare Decl., ¶ 13.)   He was referred to Kumar Vijaykumar, a New York State Code Enforcement Officer, who arranged a meeting on February 23, 2010, between himself, Hurlburt, and Hare's engineer, John Schenne.   (Hare Decl., ¶ 14.)   According to Hare, Vijaykumar told Hurlburt during the meeting that if Hare provided all documentation discussed during the meeting, Hurlburt should grant a permit and allow Hare to continue with his project.   (Hare Decl., ¶ 15.)   Hare maintains that he provided all documentation discussed at the February 23, 2010 meeting and further documentation that Hurlburt requested on March 9, 2010.   (Hare Decl., ¶ 16.)

It is at this point that Hare maintains Hurlburt began retaliating against him for contacting the New York State Code Enforcement Office.   (Hare Decl., ¶ 17.)   On May 17, 2010, Hurlburt sent Hare a letter advising him that his previous building permit and variances had expired and that he would need to complete a new application and re-initiate site-plan and variance proceedings before the Village Planning Board.   (May 17, 2010 Letter, Docket No. 54-10.)   Hare claims that Hurlburt also sent him several other letters requesting additional documents that Hare had already provided multiple times. (Hare Decl., ¶ 17.)   Hare further claims that Hurlburt required him to modify his plans to meet new changes in the building code, despite Hare's position that his project should have been grandfathered.   (Hare Decl., ¶ 18.)

On July 6, 2010, Hare filed an Article 78 petition against the Village of Warsaw in New York State Supreme Court challenging the Village's refusal to renew his original building permit.   (Hare Decl., ¶ 19.)   Hare maintains that he was retaliated against for

that action as well.   (Hare Decl., ¶ 20.)

On August 31, 2010, Village Attorney DiMatteo sent Hare's lawyer a proposal to possibly resolve the Article 78 proceeding, wherein he identified information that the Village required for the project to move forward, including development of a construction schedule and submission of engineer certifications.   (August 31, 2010 Letter, Docket No. 54-13.)   The parties further discussed DiMatteo's proposal at an Article 78 meeting on September 30, 2010.   (Article 78 Meeting Minutes, Docket No. 54-14.)

On March 30, 2011, Hare applied for a new building permit.   (March 30, 2011 Application for Building Permit, Docket No. 54-17.)   On April 5, 2011, Hurlburt wrote to Hare and advised him that he was denying his building permit application because it was incomplete.   (April 5, 2011 Letter, Docket No. 54-18.)   Hurlburt further advised Hare that his application would be reconsidered if he submitted documentation concerning five areas identified in the letter.   (April 5, 2011 Letter, Docket No. 54-18.)

On April 28, 2011, Hare submitted a new application for a building permit.   (April 28, 2011 Application for Building Permit, Docket No. 54-19.)   Hare also applied for site-plan approval.   (Application for Site Plan Approval, Docket No. 54-23.)

Thereafter, Hurlburt continued to request additional information relative to the Harenton Hotel project.   For example, on May 10, 2011, Hurlburt requested that Hare provide his resume, work experience, and education background, along with the same information for his contractors, which Hare maintains is an "unusual and unprecedented" request.   (Hare Decl., ¶ 20.)   And according to at least one member of the Zoning Board of Appeals, Kevin Miller, this request was unusual: Miller had never seen an application

come before the zoning board with resumes for contractors. (Deposition of Kevin Miller ("Miller Dep."), Docket No. 60-1, pp. 32-33.)

On July 21, 2011, the Zoning Board of Appeals held a public hearing to address whether Hare's building permit application was complete. (July 21, 2011 Zoning Board of Appeals Minutes, Docket No. 54-16.) After hearing from Hurlburt, DiMatteo, Hare, and others, including the public, the Board identified deficiencies in Hare's application and unanimously determined that it was incomplete. (July 21, 2011 Zoning Board of Appeals Minutes, Docket No. 54-16.)

During that meeting, Board member Valerie Duell, one of five board members, spoke out against Hare's project. Duell said that she did not want to see the Harenton Hotel project continue, that she would vote against the project, and that she thought Hare was only using the project to defraud elderly investors. (Hare Decl., ¶ 21; Miller Dep., pp. 27, 28; Deposition of Valerie Duell ("Duell Dep."), Docket No. 60-2, pp. 15, 16; Zoning Board Transcript, Docket No. 60-3, pp. 2, 3.)

Hare maintains that Duell had previously spread false information about him and the project due to personal ill will from an unrelated business matter. (Hare Decl., ¶ 22.) For example, Duell had previously contacted Hare's investors and lenders and told them that Hare was abandoning the project and that it would not go forward, which caused Hare to lose support. (Hare Decl., ¶¶ 23-25.)

One such investor, Arthur Crater, testified that Duell approached him and asked whether he was involved with Hare's project. (Deposition of Arthur Crater ("Crater Dep."), July 14, 2014, Docket No. 59-6, p. 6.) When he confirmed that he was, Duell

said, "Well, it's never going to happen." (Crater Dep., pp. 6-7.) Crater further testified that he also once discussed the Harenton Hotel project with DiMatteo. (Crater Dep., p. 7.) When Crater inquired about the status of the project, DiMatteo said, "Danny's [referring to Hurlburt] never going to let it happen. It's not going to go anywhere." (Crater Dep., pp. 7-8.) When Crater pressed DiMatteo for a fuller explanation, DiMatteo simply reiterated that Hurlburt was not going to let the project happen. (Crater Dep., pp. 8, 9.)

Tom Englerth testified that Hare had "a lot of enemies here in Warsaw," which made it hard for him to "fight the system." (Deposition of Thomas Englerth ("Englerth Dep."), Docket No. 59-7, pp. 10-11.) Englerth confirmed one such enemy as Duell, who owned a lumber or building supply store in Warsaw. (Englerth Dep., pp. 9-12, 28.) According to Englerth, Duell "hates" Hare because Hare allegedly "gypped" her out of money in a previous business transaction. (Englerth Dep., pp. 10, 28.) Englerth testified that Duell "couldn't stand" Hare and that she had pledged to "do whatever she could to make sure he didn't succeed" and that she would be "glad when he doesn't." (Englerth Dep., p. 11.)

On September 26, 2011, Hare served a Notice of Claim on the Village of Warsaw and Hurlburt, under N.Y. Gen. Mun. L. § 50-h. (Notice of Claim, Docket No. 59-3.) An examination relative to Hare's Notice of Claim was held on November 28, 2011. (§ 50-h Examination Transcript, Docket No. 59-5.) The claim has not been approved or paid. (Affirmation of Alan J. Knauf, Docket No. 59, ¶ 7.)

On January 23, 2012, the Village Planning Board directed Hare to submit new

building plans by January 30, 2012, which he did.    (Hare Decl., ¶ 32.)

On February 6, 2012, the Wyoming County Planning Board disapproved Hare's site plan.    (Wyoming County Planning Board Action, Docket No. 54-24.)

After determining that further efforts to obtain approval would be futile and economically unfeasible, Hare filed the instant action on March 24, 2012.    (Docket No. 1.)

### III. DISCUSSION

Hare asserts five causes of action.    His first two assert federal claims: retaliation in violation of the First Amendment and denial of equal protection under the Fourteenth Amendment.    Hare's remaining causes of action assert state claims: intentional infliction of emotional distress; negligent infliction of emotional distress; and tortious interference with business contract.    Defendants seek summary judgment on each claim.

### A.    Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).    A fact is "material" if it "might affect the outcome of the suit under the governing law."    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).    An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."    Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion."    Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609,

26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the non-moving party. Anderson, 477 U.S. at 252.

In the end, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In doing so, the court must be mindful that "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

**B.     42 U.S.C. § 1983**

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws.   See 42 U.S.C. § 1983. To prove a cause of action under § 1983, a plaintiff must establish that the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."   Wharen v. County of Fulton, 126 F.3d 400, 405 (2d Cir. 1997); Hubbard v. J.C. Penney Dep't Store, 05-CV-6042, 2005 WL 1490304, at *1 (W.D.N.Y. June 14, 2005).

Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983.   See Haygood v. City of New York, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999).   It is well settled in this circuit that personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983.   See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates."   Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).   Personal involvement need not be active participation.   It can be found "when an official has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference

by failing to act." See Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989).

Thus, personal involvement can be established by showing that

> (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to others' rights by failing to act on information indicating that constitutional acts were occurring.

Liner v. Goord, 582 F. Supp. 2d 431, 433 (W.D.N.Y. 2008) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)); Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir. 2003).

On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Hare's federal claims are grounded in the First and Fourteenth Amendments.

**C.    Hare's Federal Claims**

### 1.    First Amendment Retaliation Claim

To establish a First Amendment retaliation claim under § 1983, a plaintiff must prove that "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury."   Dorsett v. County of Nassau, 732 F.3d 157, 160 (2d Cir. 2013); see Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 91 (2d Cir. 2002).

Hare has presented sufficient evidence that he engaged in conduct protected by the First Amendment when he contacted Vijaykumar to intervene with Village of Warsaw employees and then subsequently filed an Article 78 proceeding.   This conduct is protected by the First Amendment, and Defendants do not argue otherwise.   See Dougherty, 282 F.3d at 91 (citing Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988)) ("The rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment."); see also United Mine Workers v. Illinois State Bar Ass'n., 389 U.S. 217, 222, 88 S. Ct. 353, 19 L. Ed. 2d 426 (1967) (describing the right to petition the government for redress of grievances as "among the most precious of the liberties safeguarded by the Bill of Rights" and is "intimately connected . . . with the other First Amendment rights of free speech and free press")).   Consequently, there is sufficient evidence in the record from which a finder of fact could conclude that Hare engaged in conduct protected by the First Amendment.

There is not, however, sufficient evidence that Defendants retaliated against Hare *because* he contacted Vijaykumar or filed the Article 78 proceeding.   It is well settled that

14

protected activity must precede any purported retaliation to establish a First Amendment retaliation claim. Parkash v. Town of Southeast, No. 10-CV-8098, 2011 WL 5142669, at *7 (S.D.N.Y. Sept. 30, 2011). And while there is no bright-line rule identifying the point at which a temporal relationship between protected activity and retaliatory conduct is too attenuated to support causation, courts have found a limit of two or three months to be reasonable. Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001); Adams v. Ellis, No. 09-CV-1329, 2012 WL 693568, at *16 (S.D.N.Y. Mar. 2, 2012).

The retaliation alleged here is a "multi-year delay of further permit extensions." (Plaintiffs' Memorandum of Law, Docket No. 63, p. 9; see also Amended Complaint, ¶ 132 (alleging that the defendants "unduly delayed" Hare's permit renewal); Amended Complaint, ¶ 134 (alleging "inordinate delay of the granting of Plaintiff's permit request").) But the undisputed record evidence shows that Hare's efforts to secure a permit extension or new permit were already in process and being "delayed" before he contacted Vijaykumar or filed the Article 78 proceeding.

Hare applied for the permit extension at issue on October 5, 2009. (Hare Decl., ¶ 9; § 50-h Transcript, p. 10.) Shortly thereafter, Hurlburt denied Hare's application and informed him that (1) he would have to re-apply for his building permit because there was no record of his project, (2) Williams "had done everything wrong," and (3) his prior applications were incomplete. (Hare Decl., ¶¶ 9, 10; § 50-h Transcript, pp. 10-11.) Hurlburt subsequently issued a "Stop Work" order and the Village Attorney again advised Hare that he would have to start the permit application process over again if he wanted

to continue with his project.  (Hare Decl., ¶¶ 11, 12.)   In November 2009, Hare brought Hurlburt a set of prints, but Hurlburt again advised Hare that further investigation and documentation would be required before the project could proceed, resulting in further delay.  (§ 50-h Transcript, p. 11.)

It was not until February 2010—some three months later—that Hare contacted the New York State Code Enforcement Office and arranged a meeting with Vijaykumar. (Hare Decl., ¶¶ 13, 14.)   While Hare contends that Hurlburt began retaliating against him after the meeting with Vijaykumar by requesting additional documents and requiring him to modify his plans to meet new building code requirements, there is no evidence that Hurlburt treated Hare any differently after the meeting than he had before it.   (Hare Decl., ¶¶ 17, 18.)

Long before the meeting, Hurlburt was requesting documents from Hare and telling him that his permit applications would have to be in order before a permit could issue. The Village Attorney advised him similarly.   The meeting with Vijaykumar then confirmed what Hurlburt had been telling Hare all along: Hare's permit applications were incomplete and further documentation would be needed before a new permit could be issued.   (Hare Decl., ¶¶ 15, 16; Deposition of Kumar Vijaykumar ("Vijaykumar Dep."), August 8, 2014, Docket No. 54-9, pp. 12, 13, 15.)

Each of Hurlburt's actions taken before and after the Vijaykumar meeting were the natural outgrowth of his initial determination that Hare would have to supplement his building permit application until it was complete.   Hurlburt remained consistent in this position both before and after Hare contacted Vijaykumar.   There is simply no

16

evidence—and Plaintiffs point to none—that Hurlburt treated Hare differently, let alone in a retaliatory manner, after Hare contacted Vijaykumar. Consequently, no reasonable juror could find that Hurlburt or any of the defendants retaliated against Hare because he contacted the New York State Code Enforcement Office. Put simply, the treatment that Hare contends is retaliatory started *before* he engaged in protected activity, thereby foreclosing his First Amendment retaliation claim.

The same is true for Hare's filing of an Article 78 proceeding on July 6, 2010. (Hare Decl., ¶ 19.) Hare maintains that Defendants retaliated against him for filing the Article 78 proceeding when Hurlburt required unusual documentation from him in May 2011 (e.g., resume, work experience, and background information) and Duell began speaking out against the project and casting aspersions on his character in July 2011. (Hare Decl., ¶¶ 20, 21, 22; Miller Dep., pp. 27, 28, 32-33; Zoning Board Transcript, pp. 2, 3.)

But even assuming that Hurlburt required unusual documentation and that Duell spoke ill of Hare and his project, there is no evidence that these actions were in any way connected to Hare's filing of an Article 78 proceeding. First, Hurlburt was requiring Hare to provide extensive documentation long before the Article 78 proceeding, as noted above. Second, Hare concedes that Duell's contempt for him and his project was not due to the Article 78 proceeding, but rather, "was motivated by personal ill will that Ms. Duell bore toward me from an unrelated business matter." (Hare Decl., ¶ 22.) Third, the temporal proximity between Hare filing his Article 78 proceeding on July 6, 2010, and Hurlburt requiring documentation 10 months later, and Duell speaking out 12 months

later, does not support an inference of retaliation. See Adams, 2012 WL 693568, at *16 (noting that courts have found a "limit of two or three months" to be reasonable).

Consequently, because the undisputed evidence establishes that the actions Hare contends are retaliatory either began before he engaged in protected activity or lack sufficient temporal proximity to support an inference of retaliation, Defendants are entitled to summary judgment on Hare's First Amendment retaliation claim. See Musco Propane, LLP v. Town of Wolcott Planning & Zoning Comm'n, 536 F.App'x 35, 39-40 (2d Cir. 2013) (summary order) ("[W]e would be hard-pressed to find a rational juror who could infer that a course of action begun before [the plaintiff's] protected speech could be caused by retaliation for that First Amendment activity."); see Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (finding that adverse actions begun before the plaintiff engaged in protected activity do not give rise to an inference of retaliation); see Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir. 2011) (causal connection established where "protected activity [is] closely followed in time by the adverse action").

### 2. Fourteenth Amendment Class-of-One Claim

"The Equal Protection Clause [of the Fourteenth Amendment] requires that the government treat all similarly situated people alike." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). When an individual who is not a member of a constitutionally protected class claims that he or she has been treated differently, that individual may pursue an equal protection claim on either a

selective-enforcement or class-of-one theory.   Cobb v. Pozzi, 363 F.3d 89, 109-10 (2d Cir. 2004).

Hare asserts a class-of-one equal protection claim.   (Amended Complaint, ¶¶ 138-143.)   To prevail on a class-of-one claim, "a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010) (quoting Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006)); see Vill. of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) (per curiam) ("successful equal protection claims [may be] brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment").   That is, a class-of-one plaintiff must prove that he or she "was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy" that an improper purpose could be the only motivation.   Clubside, 468 F.3d at 159.

To establish a class-of-one equal protection claim, a plaintiff "must provide evidence that he was treated differently from others 'similarly situated' and [that] the people who are similarly situated are similar 'in all material respects' and 'engaged in comparable conduct.'"   Komondy v. Gioco, No. 3:12-CV-250 (CSH), 2017 WL 2290148, at *9 (D. Conn. May 25, 2017) (quoting Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir.

2005) and <u>Shumway v. United Parcel Serv., Inc.</u>, 118 F.3d 60, 64 (2d Cir. 1997)). The degree of similarity between the class-of-one plaintiff and the comparator must be extremely high, such that the comparator is "prima facie identical in all relevant respects." <u>Neilson</u>, 409 F.3d at 104 (citing <u>Purze v. Vill. of Winthrop Harbor</u>, 286 F.3d 452, 455 (7th Cir. 2002)); <u>Ruston</u>, 610 F.3d at 59 ("plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves"). In the land-use context, "[t]he 'similarly situated' requirement must be enforced with particular rigor . . . because zoning decisions 'will often, perhaps almost always, treat one landowner differently from another.'" <u>Cordi-Allen v. Conlon</u>, 494 F.3d 245, 251 (1st Cir. 2007) (quoting <u>Olech</u>, 528 U.S. at 565). This high degree of similarity is necessary because "[t]he similarity and equal protection inquiries are . . . virtually one and the same in . . . a 'class of one case.'" <u>Neilson</u>, 409 F.3d at 105.

The similarity inquiry is fact-intensive. <u>Clubside</u>, 468 F.3d at 159; <u>Harlen Assocs.</u>, 273 F.3d at 499 ("As a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury."). But a court may grant summary judgment in the defendant's favor "where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." <u>Clubside</u>, 468 F.3d at 159; <u>Cruz v. Coach Stores</u>, 202 F.3d 560, 568 (2d Cir. 2000). Such is the case here.

Hare baldly claims that three projects in the Village of Warsaw were similarly situated to his, and that Defendants permitted those developers to complete their projects without opposition: (1) a chemical dependency clinic project entitled "Office Conversion" located at 20 and 22 North Main Street; (2) a chemical dependency clinic project located

at 58 West Buffalo Street; and (3) the DiMartino restaurant located at 425 North Main Street.   (Hare Decl., ¶¶ 28, 29; Amended Complaint, ¶ 82.)   Hare also states, without elaboration or supporting evidence, that "[t]he Village allowed, as a matter of routine practice, other applicants to get extensions of building permits for projects that were only partly finished."   (Hare Decl., ¶ 27.)

In light of the strict similarity standard applicable to comparators in a class-of-one claim, Hare's showing is woefully inadequate.   Hare presents no evidence whatsoever to support his claim that the three projects identified above are substantially similar, or indeed, "prima facie identical in all relevant respects" to the Harenton Hotel project. Neilson, 409 F.3d at 104.   In fact, the record evidence supports the opposite conclusion: that there were no similarly situated projects.

It is undisputed that the Harenton Hotel project was a planned multi-million dollar conversion of a 31,000 square foot nursing home into a 50-room luxury hotel with conference space.   (§ 50-h Transcript, pp. 4, 5, 7; Hare Presentation Package, Docket No. 54-5.)   The project involved not only converting the existing structure but also building two additions and constructing an apartment and carport.   (§ 50-h Transcript, pp. 4, 9; Hare Decl., ¶ 4.)   In contrast, the only evidence submitted concerning the three comparator projects indisputably reveals that they were starkly dissimilar.   The two chemical dependency projects involved remodeling office space and remodeling a small garage.   (Deposition of Daniel Hurlburt ("Hurlburt Dep."), June 12, 2014, Docket No. 54-25, p. 161.)   And the DiMartino restaurant project took less than one year to complete and did not involve any permit extension requests.   (Hurlburt Dep., pp. 165, 166.)

21

Moreover, Williams, the former building inspector, testified that he could not recall a project of similar magnitude to the Harenton Hotel project nor could he recall any project that involved multiple building permit extension requests. (Williams Dep., p. 41.) And Miller, the Zoning Board Member, testified that he could not recall any other project where the developer requested an extension of a permit or a site plan, as Hare had done for the Harenton Hotel project. (Miller Dep., p. 35.)

Consequently, this Court finds insufficient evidence from which a reasonable juror could conclude that any of the three projects identified above are sufficiently similarly situated to the Harenton Hotel project such that Hare's class-of-one equal protection claim could succeed. Defendants are therefore entitled to summary judgment.[5] <u>See</u>

---

5 In their motion papers, Plaintiffs reference "substantive due process claims." (Plaintiffs' Memorandum of Law, Docket No. 63, pp. 12-13; Plaintiffs' Memorandum of Law, Docket No. 70, p. 7.) No such claims, however, appear in the amended complaint, and Defendants do not recognize any such claims in their motion. While the bare terms "procedural due process" and "due process" appear in the opening paragraphs of the amended complaint (<u>see</u> Amended Complaint, ¶¶ 1, 2), the only federal constitutional claims pleaded are a First Amendment retaliation claim (<u>see</u> Amended Complaint, ¶¶ 129-137) and a Fourteenth Amendment class-of-one equal protection claim (<u>see</u> Amended Complaint, ¶¶ 138-143). Consequently, this Court finds that Plaintiffs have not properly asserted a substantive due process claim in this action.

There is, however, passing reference to "substantive rights under the Fourteenth Amendment" in Plaintiffs' discussion of their class-of-one equal protection claim. (Amended Complaint, ¶ 140.) Even assuming that this adequately raises a substantive due process claim, which this Court does not believe it does, Defendants would be entitled to summary judgment.

Substantive due process "protects the individual against certain government actions regardless of the fairness of the procedures used to implement them." <u>McClary v. O'Hare</u>, 786 F.2d 83, 88 (2d Cir. 1986). Where, as here, a plaintiff contends that government action infringed on his or her property rights, the plaintiff must show "a valid property interest" and that "defendants infringed on the property right in an arbitrary or irrational manner." <u>49 WB, LLC v. Vill. of Haverstraw</u>, 511 Fed.Appx. 33, 34 (2d Cir. Feb. 4, 2013). To be actionable, government action must be "arbitrary, conscience-shocking, or oppressive in the constitutional sense, not merely incorrect or ill-advised." <u>Ferran v. Town of Nassau</u>, 471 F.3d 363, 370 (2d Cir. 2006) (citation and internal quotation marks omitted).

Here, Hare has failed to demonstrate that he held protected property rights in his *expired* permits and variances. But even more problematic, Hare has failed to set forth any evidence from which a reasonable trier of fact could conclude that Defendants acted in an arbitrary, conscience-shocking, or

Clubside, 468 F.3d at 159; Cruz v. Coach Stores, 202 F.3d 560, 568 (2d Cir. 2000).

**D.     Hare's State Claims**

Having disposed of Plaintiffs' federal claims, this Court finds it appropriate to decline to exercise supplemental jurisdiction over Plaintiffs' state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and tortious interference with business contract.   See 28 U.S.C. § 1367 (c)(3).

The United States Supreme Court has instructed that courts should ordinarily decline to exercise supplemental jurisdiction in the absence of federal claims.   See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) (noting that in the usual case where all federal claims are eliminated before trial, the relevant factors informing the decision of whether to exercise supplemental jurisdiction will "point towards declining to exercise jurisdiction over the remaining state-law claims"); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

The Second Circuit shares this view: where "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."   Valencia ex rel.

---

oppressive manner.   There can be little dispute that each of Hurlburt's and the Village's decisions concerning his permit applications were grounded in local law and building code requirements.   Even assuming that Hurlburt's conclusions about what the code and local law required were wrong, as Hare maintains, that is not enough to establish a substantive due process claim.   See Ferran, 471 F.3d at 370. Consequently, this Court finds that Defendants would be entitled to summary judgment on Plaintiffs' substantive due process claim, if such a claim could be gleaned from the amended complaint.

<u>Franco v. Lee</u>, 316 F.3d 299, 305 (2d Cir. 2003); <u>see also</u> <u>Marcus v. AT&T Corp.</u>, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well.")

This Court finds this guidance particularly appropriate here, where the parties dispute the sufficiency of Plaintiff's § 50-h Notice of Claim (a state procedural device) and there is a pending motion to amend the complaint that pertains solely to the state claims. Accordingly, this Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and they are instead dismissed without prejudice under 28 U.S.C. § 1367 (c)(3).

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. Defendant's motion is granted as to Plaintiffs' federal claims and denied as to Plaintiffs' state claims, which are dismissed without prejudice under 28 U.S.C. § 1367 (c)(3). Plaintiffs' Motion to Amend, which pertains only to their state claims, is denied as moot.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 54) is GRANTED as to Plaintiffs' federal claims and DENIED as to Plaintiffs' state claims, which are dismissed without prejudice under 28 U.S.C. § 1367 (c)(3).

FURTHER, that Plaintiffs' Motion to Amend (Docket No. 64) is DENIED AS MOOT.

FURTHER, that the recent mediation-related orders (Docket Nos. 71, 72) are VACATED.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.

Dated:      September 20, 2017
            Buffalo, New York


                                        /s/William M.Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge